(70 App. Div. 186.)

JAFFE et al. v. EVANS & SONS, Limited.

(Supreme Court, Appellate Division, First Department.   March 21, 1902.)

TRADE-MARK—PATENTED ARTICLE—EXPIRATION OF PATENT—RIGHTS THERE-
AFTER.

Where plaintiffs under letters patent manufactured in Germany a
preparation of wool fat to which they gave the generic name of "Lano-
line," which they sold for 60 cents per can, their rights, after the patent
expired, were not infringed by the defendant by the manufacture and
sale, at 20 cents per can, of a practically identical product, which it
called "British Lanoline"; the label being otherwise clearly dissimilar
to that used by plaintiffs, and clearly stating where and by whom the
product was manufactured.

Appeal from special term, New York county.

Action by Benno Jaffe and another against Evans & Sons, Limited.
From a judgment for defendant, plaintiffs appeal.   Affirmed.

The suit was brought to restrain the defendant, a British corporation,
from using the word "Lanolin," or "Lanoline," which is claimed to be a
trade-mark of the plaintiffs, and from selling its product in packages simi-
lar to plaintiffs', and for an accounting.   The plaintiffs are citizens of Prus-
sia, and are engaged in the manufacture and sale of a hydrous wool-fat
preparation called "Lanoline," and until the year 1896 were protected in
such manufacture and sale, under the term "Lanoline," by United States
patent.   Although such patent has now expired, and they admit that every
one is at liberty to manufacture and sell their article, they claim to have
a trade-mark in the word "Lanoline," or words similar to it, and therefore
seek to restrain the defendant, who sells its product, both of hydrous and
anhydrous wool fat, in this country as hydrous and anhydrous "Lanoline."
The plaintiffs' and also the defendant's preparation is sold in circular tin
cans of very nearly the same size; but a comparison of the labels shows a
distinct difference, excepting that the defendant's label contains, in red
letters, the words "British Lanolin," printed horizontally and underscored,
and on the plaintiffs', in red letters, printed diagonally, are the words "Dr.
Oscar Liebreich's Lanoline," the word "Lanoline" being in large type and
on a line by itself.   The plaintiffs' label further states that the product
is made in Germany, and names and addresses there, and names and ad-
dresses of New York agents, are given.   It has also on one side two designs
denoted "Trade-Mark."   The defendant's label states that the product is
made by special plant and patent process, "produced by British enterprise
and labor only," and is "sweeter and cheaper than most makes."   English,
Canadian, and New York addresses are given, and a special trade-mark,
entirely dissimilar from plaintiffs', is placed at the top.   From the testimony
it appears that during the continuance of the plaintiffs' patent various man-
ufacturers of wool fat, prepared by differing processes, sold their products
under names other than "Lanoline."   The plaintiffs' patent related to the
process of manufacture, and the product was hydrous wool fat containing
a fixed proportion of water, which, if driven off, would again be absorbed
or taken up.   The use of the product was as a base for ointments, salves,
etc.   It was testified that the defendant's preparation of hydrous wool fat
or "Hydrous Lanolin" was essentially the same in character as the plain-
tiffs' "Lanoline," and could be used as well.   One druggist said, "They ap-
peared to be identical," but that when he bought the British product he
knew it was not the plaintiffs', and there was no confusion.   He would in
his work use from either can.   Another pharmacist testified that the Brit-
ish manufacture was so labeled he would not be deceived at all as to what
he was getting; that he tried it, and, as it is cheaper, he now uses no other.
The plaintiffs' "Hydrous Lanolin," according to the testimony, contained
about 40 per cent. of water, which brought it within the requirements of
the trade.   Leading text-books and manuals were used in evidence in which
the word "Lanoline" is defined as a "mixture of 75 per cent. pure wool fat

and 25 per cent. water"; and in the Standard Dictionary "Lanoline" is defined as "an unctuous fatty mixture, * * * with fatty acids obtained from various kiratin tissues, as the wool of sheep. * * * (L. lano, wool; oleum, oil.)" Upon the evidence the special term dismissed the complaint, and from the judgment so entered the plaintiffs appeal.

Argued before VAN BRUNT, P. J., and HATCH, O'BRIEN, INGRAHAM, and LAUGHLIN, JJ.

Louis C. Raegener, for appellants.

Charles W. Lefler, for respondent.

O'BRIEN, J. We might well rest our affirmance of this judgment upon the statement of the law as contained in the opinion of the learned judge at special term. The insistence of the appellant, however, that the case presents questions of fact and not of law, requires that we again examine the record.

In the leading case of Singer Mfg. Co. v. June Mfg. Co., 163 U. S. 169, 16 Sup. Ct. 1002, 41 L. Ed. 118, it is said:

"The result, then, of the American, the English, and the French doctrine universally upheld is this: That where, during the life of a monopoly created by a patent, a name, whether it be arbitrary or be that of the inventor, has become, by his consent, either express or tacit, the identifying and generic name of the thing patented, this name passes to the public with the cessation of the monopoly which the patent created."

That case is also authority for the further statement that one who avails himself of this public dedication may use the generic designation in all forms with the fullest liberty, by affixing such name to the machine or product, and by referring to it in advertisements, subject, however, to the condition that the name must be so used as not to deprive others of their rights or to deceive the public, and that the name must be accompanied with such indications as will show by whom it is made, so the public may be informed of that fact.

In the present case, if the word "Lanoline," or "Lanolin," is generic or descriptive of the article,—which we think, upon the evidence adduced, it is,—it follows that the defendant may use the word, provided its preparation is substantially the same product as plaintiffs', and the word is accompanied with indications which show clearly that the defendant is the manufacturer. This necessarily includes the other proposition, that the defendant has no right to manufacture something entirely different, and call it "Lanolin"; nor would it have the right to use that name in advertisements or labels in such a way as to deceive the public into thinking its product was the one manufactured by the plaintiffs. As said in the cases from which we have already quoted (Singer Mfg. Co. v. June Mfg. Co., supra):

"The public having the right, on the expiration of the patent, to make the patented article, and to use its generic name, to restrict this use, either by preventing its being placed upon the articles when manufactured, or by using it in advertisements or circulars, would be to admit the right and at the same time destroy it. It follows, then, that the right to use the name in every form passes to the public with the dedication resulting from the expiration of the patent."

The law being settled, therefore, what the plaintiffs claim is that the words "British Lanolin Hydrous" and "British Lanolin Anhydrous" do not honestly describe the defendant's product, and, al-

though the word may be descriptive, it was unnecessary for the defendant to use it on its labels, and thus injure the plaintiffs. Taking up this last proposition first, if defendant had the right to use the name, even though such use might have injured the business of the plaintiffs,—which was likely, since the latter, according to the evidence, charged 60 cents a can, while the defendant's price was 20 cents,—nevertheless the court would have no right to interfere unless by imitating the plaintiffs' label, or by simulating the appearance of the packages, the defendant was guilty of fraud upon the public in endeavoring to palm off its own product as the one manufactured by the plaintiffs.

There was upon the trial no proof offered that would justify the court in finding, nor did it find, there was any fraud or misrepresentation on the part of the defendant; nor did the defendant introduce any confusion in the trade; nor did it appear that any one was misled by the expression "British Lanolin," as employed by it, into believing that he was purchasing the plaintiffs' "Lanoline," which is made in Germany; nor does it appear that there was any marked likeness in the label or dress of the goods of the parties; and, therefore, the whole dispute turns upon defendant's right to use the word "Lanolin," which, as we have said, being descriptive of the article, it might do, provided the word honestly described the defendant's product, and that product did not essentially differ from the plaintiffs'. Both use wool fat as the basic ingredient, and, though it was not shown (nor was it important) precisely how either product was manufactured, the goods sold had common characteristics. The plaintiffs' product consisted of wool fat prepared by a certain process, containing, besides wool fat, about 25 per cent. of water. The defendant's preparation, referred to as "British Hydrous Lanolin," in addition to wool fat contains, as testified, about 30 per cent. of water. Further, it was shown the two preparations were substantially the same in nature; and there was other proof tending to show that Lanoline was accepted as standard if it contained no more than 30 per cent. of water; and it appears that the ability of the prepared wool fat to take up a large amount of water, which, if driven off, is again absorbed, is characteristic of the product termed "Lanoline," which characteristic the defendant's preparations indisputably had. "Hydrous" is the scientific term indicating the presence of water, while "anhydrous" signifies the absence of water and the quality of taking it up. The term "anhydrous," therefore, might properly be applied to the plaintiffs' product after the water it contained was driven off; and thus it becomes evident that the use of the words "hydrous" and "anhydrous," in connection with "Lanoline," would have a definite meaning, and be entirely understood by every one familiar with its nature and characteristics. Hence no one would be misled by the addition of these words, although, strictly speaking, the phrase "Hydrous Lanolin" may be tautological, and "Anhydrous Lanolin" a contradiction of terms. What the defendant sold was the product in its two forms.

In view of the fact that the defendant had two preparations of wool fat, designated as "Hydrous" and "Anhydrous" Lanolin, the one con-

taining water in the first instance, and the other without water, but capable of absorbing it, as was clearly indicated by the terms used, any question of fraud or deception was eliminated so far as the public was concerned, and particularly as the name by whom and the place where manufactured was expressly stated was there no probability of any one being deceived into thinking that the defendant's was the plaintiffs' product. So far as the manufacture of "British Hydrous Lanolin" was concerned, it was substantially the same article or product as was manufactured by the plaintiffs, and no deception was practiced. Nor was there any deception in the sale of "Anhydrous Lanolin," which the plaintiffs make no claim of preparing for sale. We think, therefore, that there was nothing to prevent the defendants from applying to their product, as prepared, the terms which truthfully represented the inherent elements and characteristics of Lanoline.

Upon the facts, therefore, as well as upon the law, we think that the special term was right in the conclusion reached, and the judgment accordingly should be affirmed, with costs. All concur.